# EXHIBIT A

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is dated as of May 6, 2016 ("Effective Date") by and between JONES LANG LASALLE AMERICAS, INC., a Maryland company ("JLL" or the "Company"), and Jubeen Vaghefi, an individual whose residential address is 4401 San Jose Lane, Jacksonville, Florida 32207 ("Employee").

JLL and Employee mutually desire Employee to provide services to JLL in its Miami, Florida office pursuant to the terms and conditions set forth below:

1. **Engagement of Services.**

    (a) This Agreement is contingent on Employee's successful completion of a background check and a drug test in compliance with JLL's Background Investigations and Drug Screening policies. Employee also agrees to comply with all other JLL policies, including but not limited to JLL's Code of Business Ethics and Americas Capital Markets Compensation Plan for Producers ("Comp Plan"), copies of which are available to Employee on JLL's intranet site. Employee acknowledges and agrees that a positive culture is highly important at JLL and that collaboration within JLL, teamwork, and integrity are the key attributes that define JLL's culture. Such collaboration by Employee includes, but is not limited to, adherence to all Company client-management protocols and compliance with the Company's Cross Selling Guidelines and Fee Sharing Policy.

    (b) Except as disclosed to JLL in writing prior to the Effective Date, Employee represents that Employee is not bound by any restrictive covenants, court orders, laws, or regulations, such as non-solicitation, confidentiality, or non-compete agreements, or other obligations or commitments of any kind, that would prevent, restrict, or interfere with Employee's performance of all duties and services contemplated hereunder. Employee is encouraged to seek Employee's own legal counsel for clarification of any such restrictions or obligations. Employee agrees not to violate any such obligations or restrictions while performing any services on behalf of the Company.

    (c) Employee acknowledges and agrees that Employee's primary duty for the Company is making sales or obtaining orders or contracts for commercial real estate services, for which consideration will be paid by the Company's clients or other third parties. Employee also acknowledges and agrees that he will customarily and regularly be engaged away from the Company's place of business (including away from any home office that Employee might maintain), and Employee will perform services on behalf of the Company at the client's place of business, at targeted transaction sites, or otherwise away from Company's regular place of business. Employee agrees that Employee is engaged exclusively by Company and owes Company a duty of loyalty, and that unless authorized by Company in writing, Employee may not perform similar services on behalf of any other entity or for Employee's own account.

    (d) Employee holds an appropriate real estate license in the state(s) in which Employee works and Employee agrees to comply with all provisions of applicable real estate licensing law. Without limiting the foregoing, (i) Employee agrees that Employee's licensed activities will be supervised by the designated or qualifying broker, broker of record, or other supervising broker, to the extent required by, and in accordance with, state law; (ii) Employee's compensation will be as provided in Exhibit A to this Agreement; and (iii) Employee's duties will be as described in this Agreement, as supplemented by Employee's managers, supervising broker, or a designated representative of the Company from time to time.

    (e) Employee shall be entitled to use the external title of Managing Director and shall hold the internal title of International Director. Employee will initially report to Jay Koster, Group Head, Capital Markets, or other such person as designated by JLL from time to time.

2. **Compensation & Expenses.** JLL will provide Employee compensation and expense reimbursement in accordance with the attached Exhibit A. Employee agrees that revenue for any and all commercial real estate activities in which Employee is involved during the Term of this Agreement belongs to Company and Employee will be paid Employee's share of that revenue consistent with this Agreement.

3. **Benefits.** Employee may elect to participate in JLL's employee benefits program, which includes medical, dental, life, disability insurance, and a 401k savings and retirement plan. Employee's participation in those benefits is governed by the applicable Company policies and benefits plans.

4. **Term of Agreement**.

(a) Employee's employment will not be for a fixed period of time, but will be "at will." This means that Employee or the Company may terminate Employee's employment, or the Company may change the terms and conditions of Employee's employment, at any time, with or without notice or cause.

(b) Upon a termination of this Agreement for any reason, Employee is entitled to receive, consistent with this Agreement and applicable law (i) earned but unpaid commission payments for transactions that close during the Term of this Agreement only; and (ii) reimbursement for appropriate business expenses that Employee incurs during the Term of this Agreement. Upon a termination of this Agreement by Employee for any reason or by Company without Cause, and if Employee executes and does not revoke a Confidential Separation Agreement and General Release to be drafted by Company, Employee is entitled to receive the additional payments and benefits provided by the Comp Plan then in effect (which presently includes payment of commissions earned for certain transactions that close subsequent to the Term of the Agreement), except that any payment is subject to offset, as permitted by law, for any outstanding loans, company credit card balances, or other debts that Employee owes Company.

(c) Except as provided in this Paragraph 4, Employee agrees that any compensation or benefits Employee receives relating to termination of this Agreement is governed solely by this Agreement, and Employee is not eligible for any other compensation or benefits, including, without limitation, severance benefits under the Jones Lang LaSalle Incorporated Severance Pay Plan, as amended from time to time.

(d) This Agreement will terminate automatically on the date of Employee's death or disability other than: (i) commission payments as provided by the Comp Plan then in effect; and (ii) reimbursement for appropriate business expenses that Employee incurs during the Term of this Agreement, but only to the date of Employee's death or disability. Any compensation payable as a result of Employee's death will be paid to Employee's designated beneficiary.

5. **Definitions**.

(a) For purposes of this Agreement, "Termination with Cause" is defined as Employee's: (i) material breach of a provision of this Agreement; (ii) sustained underperformance or refusal to perform the duties assigned under this Agreement; (iii) material breach of the Company's Code of Business Ethics or other policies; (iv) commission of (x) an act or omission that is willful misconduct or gross negligence, (y) an act that results in a conviction of a felony or any lesser crime involving fraud, theft, dishonesty, or violence, or (z) an act of dishonesty that adversely affects the business of the Company or its Affiliates; or (v) commission of an act or omission that results in the suspension or revocation of Employee's real estate license.

(b) For purposes of this Agreement, "Disability" excludes a "Termination with Cause" and means a physical or mental condition resulting from any physical or mental impairment that renders Employee incapable of fully performing his duties under this Agreement, even with reasonable accommodation, and that is expected to result in death, or that has lasted or is expected to last for a continuous period of at least four (4) months in any twelve (12) month period and that results in Employee qualifying for Social Security disability benefits. All amounts payable upon the Disability of Employee will be payable to Employee or, in the discretion of the Company, to Employee's legal guardian or representative.

6. **Nonsolicitation**. During the Term of this Agreement, and if terminated by the Company for Cause or by Employee for any reason, for twelve (12) months after such termination, Employee may not without prior written consent of the Company, personally or as an employee, stockholder, director, investor, owner, consultant, manager, member, associate, partner, agent, independent contractor, or otherwise, or by means of any corporate or other device: (a) other than on behalf of the Company, solicit from clients of the Company or any of the Company's Affiliates any existing or pending transactions or assignments, or solicit or encourage such clients to discontinue their existing or pending transactions or assignments with the Company or reduce their consideration of the Company for pending transactions or assignments, except that Employee is not prohibited from accepting or responding to unsolicited calls or contact, including accepting or responding to requests for proposals and requests for quotes; or (b) solicit or encourage any officer, director, employee, consultant, agent, or independent contractor employed or retained by the Company or any of its Affiliates during the term of this Agreement to leave the employ or retention of Company or its Affiliates, other than through a general solicitation that does not specifically target

employees or consultants of the Company. Employee's post-employment solicitation of Jeffrey Morris and Dennis St. Romain will not be considered a violation of this Paragraph 6.

7. **Confidentiality.** Employee agrees that except as required by law or court order Employee will keep confidential all Confidential Information Employee has except as authorized by the Company in writing. "Confidential Information" means information that is designated confidential or proprietary by Company, whether or not it is expressly stamped or identified as confidential, including information regarding the Company and its Affiliates, and Company clients, relating to: (a) operations, assets, liabilities, or financial condition; (b) pricing, sales, marketing, costs, joint ventures, and business alliances; (c) client lists or other information regarding current or prospective clients, including information regarding their identities, contact persons, purchasing patterns and terms and conditions of any contractual relationship; (d) employees or sales representatives, compensation, and compensation plans; (e) business plans, marketing plans, or strategies, unique business methods, trade secrets, and proprietary information; and (f) any other types of information typically or regularly considered or treated as confidential or proprietary.

8. **Remedies.** Employee acknowledges that: (a) the restrictions in Paragraphs 6 and 7 are (i) reasonable and necessary to protect the legitimate interests of Company and the value of the goodwill associated with the operation of the Company, and (ii) do not cause Employee undue hardship, and (b) any violations of any provision of Paragraphs 6 and 7 may result in irreparable injury to the Company and therefore, the Company is entitled to injunctive relief, in addition to any other remedies in equity or law to which the Company may be entitled. The parties agree that if a court or tribunal of competent jurisdiction finds that any provision in Paragraph 6 or 7 is invalid or unenforceable, then that court or tribunal will have the power to reduce the scope, duration, or geographic area of the provision, to delete specific words or phrases or to replace any invalid or unenforceable provision with a provision that is valid and enforceable and that comes closest to expressing the intent of the invalid or unenforceable provision. Paragraphs 6 and 7 will be enforceable as so modified. If Employee violates Paragraph 6 or 7, the period for which Employee is to be restricted will be suspended during the time that Employee violates the terms and the remaining period for which the restriction applies will recommence on the date that Employee ceases to violate those terms.

9. **Intellectual Property.** Employee agrees to assign to JLL his entire right, title and interest in any invention or idea, patentable or not, that Employee create or conceive of (a) during his employment by JLL and for six (6) months thereafter, and (b) which relates in any manner to JLL's actual or anticipated business, researchs or development, or is suggested by or results from any task assigned to Employee or any work Employee performed for, or on behalf of, JLL. Employee agrees to promptly disclose to JLL Legal Services any invention or idea contemplated above, and upon request, Employee will execute a specific assignment of title to JLL, and do anything else reasonably necessary to enable JLL at its expense to secure a patent therefore in the United States and in foreign countries.

10. **Return of Documents and Property.** Upon termination of Employee's engagement with the Company for any reason, Employee will return to the Company all Company-related documents in Employee's possession or control, including but not limited to documents that include or reflect Confidential Information as identified in Paragraph 7, whether in electronic or other format, mobile phone(s), computer(s), iPhones, or other similar device(s), compensation manual(s) and credit cards (it being understood that the balance of such credit cards that are not supported by appropriate expense reports within 30 days after termination of the engagement are the sole obligation of Employee). At Company's request, Employee will certify in writing Employee's full compliance with this Paragraph 10. The actual value of the property not yet returned under this paragraph and the balance on any corporate credit cards for which the Employee is not entitled to reimbursement from the Company may be set off from any payment otherwise due to Employee under this Agreement.

11. **Governing Law.** This Agreement is governed by the laws of the State of Illinois.

12. **Jury Trial Waiver.** The parties knowingly and willingly waive a trial by jury in any dispute arising out of or in any way related to this Agreement.

13. **Waiver.** The failure of either party to insist in any one or more instances upon performance of any term, covenant or condition of this Agreement does not waive future performance of the term, covenant, or condition, which continues in full force and effect.

14. <u>Severability and Other Rules of Construction</u>. Each provision of this Agreement must be interpreted where possible in a manner necessary to sustain its legality and enforceability. The unenforceability of any part or provision of this Agreement in a specific situation does not affect the enforceability of (a) that part or provision in another situation or (b) the other parts or provisions of this Agreement if they could then conform with the purposes of this Agreement and the law.

15. <u>Fees and Expenses</u>. If there is any litigation to enforce this Agreement, the prevailing party is entitled to recover its reasonable attorneys' fees and expenses.

16. <u>Consideration</u>. Employee agrees that Company's promises in this Agreement provide good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged. Employee further agrees that Employee enters into this Agreement voluntarily and that Employee bargained for the terms of the consideration of this employment and, that by signing below, Employee is aware of his right to consult an attorney before signing this Agreement and has either consulted an attorney or elected not to exercise that right.

17. <u>Counterparts</u>. This Agreement may be executed in counterparts, any of which may be executed and delivered via facsimile or other electronic delivery, each of which shall be deemed an original, and all of which, taken together, shall constitute one and the same instrument.

18. <u>Entire Agreement</u>. This Agreement, including the attached Exhibit A, embodies the entire agreement and understanding between the parties with respect to the subject matter and supersedes all prior agreements and understandings between the Company and Employee with respect to this subject matter. This Agreement may be amended only by written agreement signed by each party.

JUBEEN VAGHEFI                                     JONES LANG LASALLE AMERICAS, INC.

_[signature]_

By: _[signature]_
Name: James L. Kuhr II
Title: Executive Vice President

## EXHIBIT A

### Draw

Employee will be paid an annualized draw of $180,000, less applicable payroll deductions and paid consistent with the Company's regular payroll process and schedule, $35,000 of which will be non-recourse.

### Commissions

The Company will pay Employee commissions consistent with the Comp Plan, as modified from time to time, and on attributed revenue calculated at the following percentages:

| Calendar Year Revenue Credit Attributed to Employee | Commission % |
|---|---|
| $0-$500,000 | 50% |
| $500,001-$750,000 | 55% |
| Over $750,000 | 60% |

Commission percentages are calculated against revenue attributed to Employee. Revenue will be attributed from commissions or other fees the Company actually receives, less third-party payments such as outside co-brokerage fees or client fee-sharing, if such revenue can be recognized as income consistent with the Company's regular accounting practices.

### Forgivable Loan

Within the first payroll cycle after the Effective Date, JLL will provide Employee with a forgivable loan in the amount of Two Million Two Hundred Fifty Thousand Dollars ($2,250,000.00) pursuant to the terms of a separate promissory note to be provided by the Company. Employee will be required to sign the promissory note as a condition to receiving the forgivable loan. JLL agrees to reimburse Employee annually the lesser of $2,500 or the actual cost of a term life insurance to cover his repayment obligation for the unforgiven portion of the loan under the promissory note.

### Deferred Performance Bonus

Employee will be eligible to earn compensation of up to a maximum cumulative of up to $1,000,000 in the form of a deferred performance bonus upon Employee's "**Team**" (consisting of the Florida Capital Markets Group) achieving annual Team revenue of at least $12,000,000. Upon achieving annual Team revenue of at least $12,000,000, Employee will be eligible to be paid a performance bonus of $200,000. Employee may earn a performance bonus a maximum of five times any time between calendar years 2016 and 2022. There is a maximum of one payment in any one year. Any performance bonus shall be payable annually after the revenue hurdle is verified but in no event later than 90 days from year end. For Employee to be eligible to receive the performance bonus, Employee must be employed with the Company on the date it is paid.

### Personnel and Marketing Costs

Company, with input from Employee, will agree on an appropriate annual budget for personnel and marketing costs to support the business. Staff bonuses will be reserved and paid consistent with prior practice for the Team.

PROMISSORY NOTE

$2,250,000                  Chicago, Illinois
May 6, 2016

Jubeen Vaghefi ("Maker") executes this Promissory Note ("Note") in favor of Jones Lang LaSalle Americas, Inc., a Maryland corporation (or its successors and assigns) ("Holder"). Maker acknowledges that as part of the consideration for Holder to enter into an Employment Agreement with Maker dated May 6, 2016 ("Agreement"), Holder agrees to make a cash loan to Maker subject to the conditions of this Note and those contained in the Agreement. Maker agrees to repay the Debt (as defined below) under the terms of this Note.

1. <u>The Debt</u>

Holder agrees to make a cash payment to Maker in the gross amount of Two Million Two Hundred Fifty Thousand Dollars ($2,250,000.00) (the "Principal"). Interest shall accrue annually on the balance of the Debt from the date Holder makes the payment to Maker at the IRS required minimum rate for employee loans (1.45% for April 2016). Interest will be calculated annually and added to the unpaid Principal then outstanding (the "Debt").

2. <u>Debt Forgiveness</u>

IN SETTLEMENT OF THE DEBT AND FOR VALUE RECEIVED, Maker and Holder agree that the Debt will be forgiven at a rate of:

(a) ten percent (10%) of the original Debt plus associated accrued interest in calendar year 2016 where "Maker's Team" (consisting of the Florida Capital Markets Group) generates at least $2,000,000 in revenue credit;

(b) twelve and one-half percent (12.5%) of the original Debt plus associated accrued interest in calendar year 2017 where Maker's Team generates at least $6,500,000 in revenue credit;

(c) fifteen percent (15%) of the original Debt plus associated accrued interest in calendar year 2018 where Maker's Team generates at least $6,500,000 in revenue credit;

(d) seventeen and one-half percent (17.5%) of the original Debt plus associated accrued interest in calendar years 2019 through 2021 where Maker's Team generates at least $6,500,000 in revenue credit; and

(e) ten percent (10%) of the original Debt plus associated accrued interest in calendar year 2022 where Maker's Team generates at least $6,500,000 in revenue credit.

In the event Maker's Team generates less than $6,500,000 in revenue credit but more than $2,000,000 in revenue credit in any calendar year from 2017 through 2022, the forgiveness rate of the original Debt plus associated accrued interest will be reduced in that year by one-half; and in the event Maker's Team fails to generate at least $2,000,000 in revenue credit in any calendar year from 2016 through 2022, Maker will not receive any forgiveness of the original Debt for that calendar year (such reduced forgiveness amounts together referred to as "Reduced Annual Forgiveness"). However, if Maker's Team's total cumulative revenue for calendar years 2016 through 2022 exceeds $65,000,000 and Maker's Team generates revenue in excess of $2,000,000 in the sixteen (16) months immediately prior to April 30, 2022, any remaining balance on the Debt will be forgiven at the end of 2022, in accordance with the terms and timeframe below. If Maker's Team's total cumulative revenue for calendar years 2016 through 2022 is less than $65,000,000 but more than $42,500,000, Holder will extend the term of the Note for an additional year, through 2023, and if Maker's Team generates revenue in excess of $2,000,000 in the sixteen (16) months immediately prior to April 30, 2023, Holder will forgive the full outstanding balance of the loan at the end of that additional year, in accordance with the terms and timeframe below. If Maker's Team's total cumulative revenue from calendar year 2016 through 2022 is less than $42,500,000, Holder will extend the term of the Note for an additional two (2) years, through 2024, and if Maker's Team generates revenue in excess of $2,000,000 in the sixteen (16) months immediately prior to April 30, 2024, Holder will forgive one-half (1/2) of the full outstanding balance of the loan at the end of each of those additional two (2) years, in accordance with the terms and timeframe below. In the event the Debt is not forgiven in accordance with the above because of Maker's Team's failure to meet any of the sixteen (16) month revenue requirements set forth in this paragraph, Holder agrees to extend the

term of the Note for up to three (3) additional years and forgive any remaining balance on a dollar for dollar basis with all revenue generated by Maker's Team during the extended period only.

Additionally, if at the end of any calendar year prior to 2022 Maker's Team's cumulative aggregate revenue exceeds the product of $10 million and the number of calendar years completed under this Note beginning with calendar year 2016, Company may, at its sole discretion, choose to forgive any outstanding Reduced Annual Forgiveness in an amount no greater than the then-outstanding Reduced Annual Forgiveness.

In the event that either Jeffrey Morris or Denny St. Romain dies, becomes Disabled or otherwise ceases to be employed or engaged with Holder under circumstances that give rise to a repayment by one or both of them of amounts due under their respective promissory notes, all revenue amounts associated with achieving loan forgiveness thresholds in this Note will be subject to adjustment based on the good faith negotiation of Maker and Holder.

Forgiveness will be calculated once per calendar year, no later than March 1 of the following year, and/or, in the event of an earlier termination of the Agreement, on the termination date. Holder will treat the Debt as it is forgiven as wages, and Maker is required to pay associated payroll taxes and deductions. Holder will withhold the taxes and deductions from Maker's compensation, if any, consistent with the payment schedule as amended from time to time. If Maker's compensation is insufficient to satisfy the taxes and withholdings, Maker must choose and confirm through appropriate written documentation from Holder to (a) pay to Holder the amount of such deductions, or (b) have Holder withhold the deductions from subsequent payroll payments, as allowed by law.

3.  **Repayment**

If the loan is not forgiven by December 31, 2022 (or any extended date as set forth in Section 2 above), or if Maker resigns, dies, becomes Disabled, or is terminated for Cause under the Agreement (as those terms are defined in the Agreement) (together, the "Due Date") before the loan is forgiven in its entirety, the Debt will become due and payable within thirty (30) days after the Due Date. If, prior to December 31, 2022 (or any extended date as set forth in Section 2 above), Holder terminates Maker without Cause under the Agreement before the loan is forgiven in its entirety, the Debt will be forgiven. Subject to the other terms and conditions hereof, Maker may voluntarily prepay all or any portion of the Debt from time to time outstanding, without premium or penalty.

4.  **Default**

If Maker fails to repay the Debt within thirty (30) days following the Due Date ("Default"), any outstanding portion of the Debt shall bear interest at the rate of ten percent (10%) per annum. In the event of a Default, Holder is hereby authorized, but not required, consistent with applicable state and federal laws to (a) set-off any and all amounts due to Maker from Holder, its successors, or their subsidiaries or affiliates, including, without limitation, with respect to bonus and expense reimbursement, against the amount due from Maker under this Note, and (b) withhold payment of any such amount to Maker. This right to set-off and withholding shall also be applicable to the extent that any amount shall become due under this Note on any date other than the date set forth above and shall in no way diminish the obligation of Maker to pay all amounts due under this Note when due.

Maker agrees to pay on demand all out-of-pocket costs and expenses of Holder (including the reasonable legal fees and out-of-pocket expenses of counsel to Holder) incurred in connection with the collection of the Debt.

5.  **Warranty of Note Validity**

Maker hereby represents and warrants to Holder as of the date hereof that (a) this Note is a legally valid and binding obligation of Maker, enforceable against Maker in accordance with its terms, and (b) the execution, delivery and performance by Maker of this Note does not conflict with or contravene (i) any law, rule or regulation binding upon Maker or affecting any of Maker's assets, (ii) any provision of any contract, instrument, or agreement binding upon Maker of affecting any of Maker's assets, or (iii) any writ, order, judgment, decree, or decision of any court or governmental instrumentality binding upon Maker or affecting any of Maker's assets.

6.  **Location of Payments**

Payments are to be made to Jones Lang LaSalle Americas, Inc., attn. Chief Financial Officer, 200 East Randolph Drive, Chicago, Illinois 60601, or such other location as may be specified in writing to the Maker by the Holder of this Note.

7. <u>Note Payment Acceleration</u>

It is agreed that at the election of the Holder, and without notice, the Debt becomes immediately due and payable in the case of (a) default in the payment of the Debt when due or (b) the institution of any bankruptcy or similar proceeding by or on behalf of Maker.

8. <u>Choice of Law and Construction</u>

This Note has been made and delivered at Chicago, Illinois. Maker agrees that this Note shall be governed by and construed in accordance with the laws of the State of Illinois without giving effect to that state's conflict of laws provisions. Any action for collection on this Note may be initiated in the state or federal courts located in Chicago, Illinois, and Maker consents to jurisdiction and venue in such courts. Wherever possible, each provision of this Note shall be interpreted in a manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the least extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note.

MAKER

Jubeen Vaghefi

Date: MAY 6, 2016

HOLDER

By: James L. Koster, II
Title: Group Head, Americas Capital Markets and Investor Services

Date: 5/10/16

3